

FILED
U.S.
E.
2000 APR 20 A 10:29
LO      C. WHYTE

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ACORN**                                    **CIVIL ACTION**

**VERSUS**                                   **NO. 00-108**

**UNITED STATES ARMY**                       **SECTION "K"(2)**
**CORPS OF ENGINEERS, at al.**

## ORDER AND REASONS

### I. INTRODUCTION

#### A. Background

The plaintiff, Association of Community Organizations for Reform Now ("ACORN"),

filed a Motion for a Temporary Restraining Order and a Preliminary Injunction to prevent

defendants, the Department of Transportation ("DOT") and the Army Corps of Engineers ("the

Corps") from going forward with lock-pile testing and construction on the IHNC Lock

Replacement and Expansion project at the Inner Harbor Navigational Canal.  ACORN claims

that it is entitled to injunctive relief on two grounds.

First, plaintiff complains that the defendants have failed, under the requirements of the

National Environmental Policy Act ("NEPA"), to prepare an adequate Environmental Impact

Statement ("EIS").  Specifically, the plaintiff contends that the defendants violated an Executive

DATE OF ENTRY

APR 2 0 2000

i

Order by failing to identify and address the disproportionately high and adverse human health or environmental effects of the project on the minority and low-income populations. The plaintiff maintains that contrary to the recommendation of the EIS, a more comprehensive EIS should be prepared before the project is allowed to continue. Second, the ACORN complains that the defendants have violated section 4(f) of the Department of Transportation Act by failing to make a "special effort" to preserve historic sites impacted by this lock replacement and expansion project, especially three bridges and a wharf slated for demolition, as well as the neighborhoods that will be impacted by the project. The defendants have moved this court for summary judgment, contending that the NEPA claim and the 4(f) claim should be dismissed.

As an initial matter, the defendants contend that they are entitled to summary judgment because 1) the EIS is in full compliance with NEPA and 2) Executive Order 12898 does not create a private right of action. Moreover, the defendants argue that the Corps' selection of the IHNC site was not arbitrary and capricious. As to the section 4(f) allegations, the defendants assert that the Department of Transportation, through its agency, the Coast Guard, is not required to perform a 4(f) analysis until the Coast Guard, on behalf of the owner of the bridges slated for demolition, applies for bridge permits. Therefore, defendants contend that the motion for preliminary injunction is premature as to the 4(f) argument.

The court will begin with an introduction of the parties involved and a review of the relevant procedural history. Next, the court will discuss the statutory frameworks applicable to ACORN's claims. The court will then set forth the factual background as established by administrative record attached to the defendant's motion. Finally, the court will turn to its legal analysis and resolution of defendants' motion.

2

**B. The Parties**

Plaintiff ACORN is an Arkansas corporation registered to do business in Louisiana. ACORN has approximately 1200 members who live in the Lower Ninth Ward neighborhoods that will be affected by the Corps' project. Plaintiff's Exhibit 7, Affidavit of Marie Hurt. ACORN is committed to advancing the interest of low and moderate income people in their neighborhoods. *Id.* Its mission involves "supporting the rights of its members to live safe, healthful, productive lives in esthetically and culturally pleasing surroundings in an environment that supports diversity and variety of individual choices." *Id.* The plaintiff posits that its members face immediate and irreparable harm to property values and their enjoyment of life if the project goes forward.

Made defendants in this case are 1) the Army Corps of Engineers and 2) Rodney Slater, the Secretary of the Department of Transportation. Under NEPA, the Corps, as the lead agency on the project, is charged with the responsibility of ensuring that an adequate EIS is prepared prior to the commencement of the federally funded lock project.

**C. Procedural History**

ACORN filed its initial Motion for Temporary Restraining Order and Preliminary Injunction on January 12, 2000 against the defendants, Rodney Slater, Secretary of the Department of Transportation, and the Army Corps of Engineers, seeking to halt the lock-pile testing and prevent the construction in connection with the project. On that same day, the court denied the Motion for Temporary Restraining Order after holding a status conference with counsel for the parties, as well as representatives from the Army Corps of Engineers. The hearing on the Preliminary Injunction is set on May 1, 2000.

3

The defendants have filed a Motion to Dismiss and for Summary Judgment, and the court heard oral argument on the defendants' motion on April 12, 2000. At oral argument, counsel for the defendants argued that the plaintiff's Motion for a Preliminary Injunction should be dismissed as a matter or law, as any review by the court is limited to the information contained in the administrative record.

## D. ACORN's Claims

As indicated above, ACORN asserts claims pursuant to the National Environmental Policy Act and the Department of Transportation Act. The court understands ACORN's claims to be as follows:

First, ACORN contends that the defendants have not complied with NEPA and Executive Order 12898. Specifically, ACORN asserts that the defendants have not adequately considered the disparate impact that the project will have on the minority community and that the IHNC site selection was based on bias and racial considerations. The plaintiff points out that the neighborhoods surrounding the project are 88.8% African American and that other sites eliminated as alternatives had less impact on minorities.

Second, ACORN contends that the Corps' and Secretary's decision not to perform a 4(f) analysis contemporaneously with the EIS is arbitrary and capricious and in violation of section 4(f).[1] Plaintiff maintains that demolition of the Galvez Street Wharf and the three bridges, as well as the "constructive use" of the two historic neighborhoods that bound the project should

---

[1]The Corps itself is not responsible for performing the actual 4(f) analysis. Rather, the Corps provides the DOT, through its agency, the Coast Guard, with the information regarding historical property and parklands which may be affected by the project. With the relevant information, the Coast Guard performs the 4(f) evaluation.

4

have been addressed in a 4(f) statement, wherein alternatives are considered.

**E. Legal Standards**

### 1. Court's Review of an Agency's Action

The Administrative Procedures Act ("APA") governs judicial review of a challenged agency decision. The APA is applicable to both section 4(f) of the Transportation Act and the NEPA agency decisions. The APA, §10(e), 5 U.S.C. §706 provides in pertinent part:

> The reviewing court shall-
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> . . .or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making this determination, the court evaluates the agency's administrative record, which documents the decision-making process and justifies the agency's decision. The court should perform the review with a conscientious awareness of the limited nature of the court's function and defer to the agency's expertise. *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897 (5th Cir. 1983). The court may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). In challenging an agency decision, the plaintiff bears the burden of proving that the agency's decision is arbitrary and capricious or without observance of the procedure required by law. *Louisiana Environmental Society, Inc. v. Dole*, 707 F.2d 116 (5th Cir. 1983).

## 2. Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Stults v. Conoco*, 76 F.3d 651, 656, (5th Cir. 1996), (*citing Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 912-13 (5th Cir. 1992) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (emphasis supplied); *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

Thus, where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Finally, the court notes that the substantive law determines materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II. Statutory Framework

6

**A. NEPA**

The National Environmental Policy Act "declares a broad national commitment to

protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*,

490 U.S. 332, 348 (1989) (*citing* 42 U.S.C. § 4331). NEPA has "twin aims." *Baltimore Gas &*

*Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). First, it "ensures that the agency takes a 'hard look'

at the environmental consequences of its proposed action...." *Robertson*, 490 U.S. at 350, 356.

Second, it "ensures that the agency will inform the public that it has indeed considered

environmental concerns in its decision-making process." *Baltimore Gas*, 462 U.S. at 97 (*citing*

*Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139 (1981). However,

NEPA is process oriented, not result oriented:

> NEPA does not work by mandating that agencies achieve particular substantive
> environmental results. Rather, NEPA promotes its sweeping commitment to
> 'prevent or eliminate damage to the environment and biosphere' by focusing
> Government and public attention on the environmental effects of proposed agency
> action....

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989) (*citing* 42 U.S.C. §

4321); *Robertson*, 490 U.S. at 350 ("Although these procedures are almost certain to affect the

agency's substantive decision, it is now well settled that NEPA itself does not mandate particular

results, but simply prescribes the necessary process.").

What NEPA establishes is "important action-forcing procedures." *Robertson*, 490 U.S. at

348 (*quoting* 115 CONG. REC. 40416 (remarks of Sen. Jackson), and also citing S. REP. No.

91-296, p. 19 (1969), 1969 U.S.C.C.A.N. 2751; *Andrus v. Sierra Club*, 442 U.S. 347, 350,

(1979); and *Kleppe v. Sierra Club*, 427 U.S. 390, 409 & n. 18(1976)). "Simply by focusing the

agency's attention on the environmental consequences of a proposed project, NEPA ensures that

important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349; *Marsh*, 490 U.S. at 371 ("By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."). NEPA's requirements that the information gathered be disseminated "permits the public and other governmental agencies to react to the effects of a proposed action at a meaningful time." *Marsh*, 490 U.S. at 371. However, "[i]f the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 351. To put it another way, "NEPA merely prohibits uninformed-rather than unwise-agency action." *Id.*

NEPA requires federal agencies proposing major federal acts significantly affecting the quality of the human environment to prepare an Environmental Impact Statement. 42 U.S.C. § 4332(2)(C). An EIS is a detailed statement by the responsible official concerning, among other things, the environmental impact of the proposed action. The Council on Environmental Quality ("CEQ") issues regulations governing compliance with NEPA by federal agencies. 40 C.F.R. § 1500.1 et seq. If a significant impact is indicated, an EIS must be prepared. The "heart" of the EIS is the analysis of reasonable alternatives and alternatives eliminated during the decision-making process. 40 C.F.R. §1502.14.

NEPA imposes a duty on federal agencies to compile a comprehensive analysis of the potential environmental impacts of its proposed action, and review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record. The Fifth Circuit has stated, "To limit the judicial inquiry regarding the

8

completeness of the agency record to that record would, in some circumstances, make judicial review meaningless and eviscerate the very purposes of NEPA." *Sierra Club v. Peterson,* 185 F.3d 349, 370 (5th Cir. 1999). Often, omission of technical scientific information is not apparent from the record itself, and a court may therefore need a plaintiff's aid in calling such omissions to its attention. *Id.* Thus, the Fifth Circuit has held that the consideration of extra-record evidence may be appropriate in the NEPA context to enable a reviewing court to determine that the information available to the decision maker included a complete discussion of environmental effects and alternatives. *Id. (citing National Audubon Society v. Hoffman*, 132 F.3d 7, 14-15 (2d Cir. 1997) (*citing County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1384 (2nd Cir.1977)); *see also Sabine River Authority v. Dept. of Interior*, 951 F.2d 669, 678 (5th Cir.1992).

## B. Section 4(f)

ACORN's second claim is brought pursuant to what is commonly referred to as "Section 4(f)" of the federal Department of Transportation Act. *See* 49 U.S.C. § 303(c) (formerly 49 U.S.C. § 1653(f)). The provision in question, § 4(f)of Pub.L. 89-670, 80 Stat. 934, was enacted on October 15, 1966, and was originally codified at 49 U.S.C. § 1653(f), but has since been amended and recodified at 49 U.S.C. § 303(c).

In brief, section 4(f) requires that the Secretary of Transportation not approve any project which requires the use of any land from an historic site of national, state, or local significance unless the Secretary finds there is no feasible and prudent alternative to the use of such land, and that all possible planning has been done to minimize harm to that protected area. *National Wildlife Federation v. Coleman,* 529 F.2d 359, 368 (5th Cir.), *cert. denied*, 429 U.S. 979 (1976);

*Citizens to Preserve Overton Park*, 401 U.S. at 405 (Section 4(f) "prohibit[s] the Secretary of Transportation from authorizing the use of federal funds to finance the construction of highways through public parks if a 'feasible and prudent' alternative route exists. If no such route is available, the statutes allow him [or her] to approve construction through parks only if there has been 'all possible planning to minimize harm' to the park."). Indeed, the language of section 4(f) "is a plain and explicit bar to the use of federal funds for construction of highways through parks--only the most unusual situations are exempted." *Citizens to Preserve Overton Park*, 401 U.S. at 411.

When a project requires the use of historic property, federal authorities must prepare what is commonly known as a "Section 4(f) Statement" to show that the Secretary of Transportation has determined that there is no feasible and prudent alternative to the use of the parkland and that the harm to the property would be minimized. *See* 49 U.S.C. § 303(c). "Section 4(f) property, including historic sites, requires the preparation of a statement when it is encroached upon by a highway project. Section 4(f) by its own terms protects historic sites of local, state or national significance. In order to invoke the protections of 4(f), an historic site must meet the criteria of eligibility for inclusion in the National Register of Historic Places. 23 C.F.R. § 771.135(e).[2]

Thus, the historic site in question must at least be eligible for inclusion in the National Register before it is "section 4(f) property." *Accord Citizen Advocates for Responsible*

---

[2]It appears that the Coast Guard will be making the "approval" for 4(f) purposes and also preparing the 4(f) analysis in this case. Therefore, 23 C.F.R. § 771.135, which applies to the Federal Highway Administration, does not technically apply to the Coast Guard. However, the court can find no statute, regulation, or case which sets forth a standard for determining whether property is historic within the meaning of 4(f) when an agency other than the Federal Highway Administration prepares the 4(f). Therefore, the court cites 23 C.F.R. § 771.135 by analogy, although its application is not critical to the court's conclusions.

*Expansion v. Dole*, 770 F.2d 423, 438 (5th Cir.1985) ("Under section 4(f), property determined to be eligible for inclusion on the National Register of Historic Places is afforded the same protection as those properties already on the roll."); *Benton Franklin Riverfront Trailway & Bridge Comm. v. Lewis*, 701 F.2d 784, 786 (9th Cir.1983) ("Properties determined eligible are 'on an equal footing with property that is actually listed' in the National Register" for section 4(f) purposes).

In order to determine whether a site is eligible for inclusion in the National Register for section 4(f) purposes:[3]

> (e) In determining the application of section 4(f) to historic sites, the Administration, in cooperation with the applicant, will consult with the State Historic Preservation Officer (SHPO) and appropriate local officials to identify all properties on or eligible for the National Register of Historic Places (National Register). The section 4(f) requirements apply only to sites on or eligible for the National Register unless the Administration determines that the application of section 4(f) is otherwise appropriate.

23 C.F.R. § 771.135(e).

With these statutory frameworks in mind, the court turns to an analysis of the facts in this case.

### III. Factual Background

The Inner Harbor Navigational Canal extends approximately three miles from the Gulf Intracoastal Waterway ("GIWW") to Lake Pontchartrain. The GIWW is a major route for barge traffic between Brownsville, Texas and Apalachicola, Florida. The IHNC lock passes barge traffic between the Mississippi River at New Orleans and the GIWW. The current IHNC also serves as a connecting link for small ships traveling between the Mississippi River-Gulf Outlet

---

[3]*See* footnote 1, *supra*. 23 C.F.R § 771.135 governs the preparation of a 4(f) by the Federal Highway Administration.

("MR-GO") and the Mississippi River at New Orleans.

The current IHNC and lock were built by the Port of New Orleans in 1923. During World War II, the federal government leased the lock and a 2.1-mile reach of the canal and has assumed its maintenance and operation. The federal government purchased the lock in 1986.

Because the lock was projected to become dimensionally obsolete by 1970, the Corps began to study the possibility of building a new lock and connecting channel in 1960. Initially eight potential sites for the project were identified. Defendant's exhibit A, Site Selection report, New Lock and Connecting Channels, p. 25 (hereinafter "Site Selection Report"). The Site Selection Report, created by the Corps in 1975, listed the eight potential sites as follows: 1) the Saxonholm (Meraux) Site, 2) Bohemia Site, 3) Scarsdale Site, 4) Caernarvon Site, 5) Upper Violet Site, 6) Lower Violet Sites, 7) IHNC- Center Channel Site, and 8) IHNC East of Center Channel Site. The various sites were studied and ranked according to cost, construction difficulty, navigation benefits, navigation adequacy, local economies, relocations, social impacts, ecological impacts, ecological impacts, operations and maintenance difficulties, and public sentiment.

Eventually, the Corps narrowed the potential sites down to 1) a site at Violet, Louisiana in St. Bernard Parish and 2) the IHNC Lock Site. The 1975 Site Selection Report recommended construction of the new lock at the lower site near Violet, which is a rural area located in a brackish and saline marsh. The Violet Site was eliminated from consideration when passage of NEPA and the Clean Water Act in the late 1970's rendered it unacceptable. Furthermore, while addressing Congress in 1978, President Carter emphasized the desirability of using the existing IHNC channel, rather than constructing a new one at Violet.

12

In 1982, the Corps prepared a preliminary Draft Evaluation Report that compared twenty-eight plans at both the Violet and IHNC sites. Throughout the 1980's and into the early 1990's the Violet and IHNC sites were reevaluated. Finally, the New Orleans District announced its intention to recommend elimination of the Violet site from consideration. In January of 1991, the New Orleans District submitted an evaluation study which provided the rationale for elimination the Violet Site, and the Headquarters of the Army Corps of Engineers concurred with the report in June 1991.

The Corps prepared a Draft Environmental Impact Study ("DEIS") and a Draft Main Report ("DMR"), or notices of the same, which were disseminated to 725 entities, including federal and state agencies, and interested organizations, businesses, and individuals. The Corps received eighty-nine Letters of Comment in response to the DEIS and the DMR. Additionally, in 1997, a public meeting was held to discuss views on the proposed lock replacement.

The Corps then prepared a nine-volume Final Evaluation Report ("FER"). The first volume contains the EIS and the Main Report; the second volume contains the Corps' Community Impact Mitigation Plan ("Mitigation Plan"). Volumes 3 through 9 contain appendices with technical data to support the information contained in Volume 1. The eighty-nine Letters of Comment received from government agencies, organizations, businesses and individuals, and the transcript of the public meeting are contained in Volume 9.

The Mitigation Plan was developed pursuant to the 1991 reports of the Appropriations committees of both the House of Representatives and Senate and the Water Resources Development Act of 1986, which directed the Corps to develop a comprehensive plan and to identify and mitigate to the maximum extent pracitacble, any social and cultural impacts

associated with the project. Furthermore, the Corps was required to seek full participation of the minority groups living in the affected areas by the Water Resources Development Act of 1996.

To develop the Mitigation plan, representatives of the affected neighborhood associations, city agencies, historical/cultural societies, the Port of New Orleans, the Corps, local elected officials, and other local residents formed a Neighborhood Working Group ("NWG"). Some local residents who participated in the NWG voiced their strong opposition to the project. The Mitigation Plan contained in Volume 2 of the FER includes direct impact minimization actions and measures to indirectly compensate for those impacts which direct impact minimization cannot properly address. Included in the plan are job training assistance, business assistance programs, street and house improvements, community facilities, cultural/historical markers and displays, and new roadways. Implementation of the Mitigation Plan, as formulated by the community-based committee, is authorized to cost $35 million.

The FER was presented to the Lower Mississippi Valley Division Engineer in Vicksburg, Mississippi for review. The Division Engineer then forwarded the FER, together with his recommendations, to Corps Headquarters in Washington. After review, the Corps Headquarters coordinated filing of the EIS with the Environmental protection Agency and coordinated the FER with other federal and state agencies and the Governor of Louisiana, each of which responded with comments. Upon receipt of the comments, the Office of the Chief Engineer submitted its report to the Secretary of the Army, who issued a Report Decision on December 18, 1998. The Secretary of the Army recommended the project for construction appropriations to the President's Office of Management and Budget, and Congress ultimately approved the project and provided funding. On January 3, 2000, the Corps began lock-pile testing at the IHNC site.

## IV. Analysis

## A. NEPA

The court understands plaintiff's NEPA arguments to be twofold.  First, ACORN argues that Executive Order 12898 was not followed.  Second, ACORN argues that had the Corps conducted an objective alternatives analysis, either the Violet or Meraux sites would have been chose.  The court will address each argument in turn.

ACORN first contends that defendants did not comply with the mandate of Executive Order 12898, which reads, in pertinent part:

> To the greatest extent practicable and permitted by law, and consistent with the principles set forth in the report on the National Performance Review, each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations. . . .

3 C.F.R. 859 (1995).  Plaintiff concedes that Executive Order 12898 is generally not subject to judicial review and does not create a private right of action.  Nonetheless, plaintiff submits that Executive Order 12898 is made applicable to the Corps' action in this case through 40 C.F.R. §1502.25(a), which states that ". . . agencies shall prepare draft environmental impact statements concurrently with and integrates with environmental impact analyses and related surveys and studies required by . . . other environmental review laws and executive orders."  Thus, plaintiff concludes, the Corps should have identified and analyzed the disproportionately high and adverse effects on the minority and low-income populations that will be affected by the project.

However, because the Executive Order itself states that it is "intended only to improve the internal management of the executive branch;" by its own words, the order "shall not be

15

construed to create any right to judicial review." § 6-609, 59 Fed.Reg. at 7632- 33. The court, therefore, cannot review the EIS on this basis. *See Sur Contra La Contaminacion*, 202 F.3d 443, 449- 450 (1st Cir. 2000); *see also Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 575 (9th Cir.1998); *see also Air Trans. Ass'n of Am. v. FAA*, 169 F.3d 1, 8-9 (D.C.Cir.1999).

Plaintiff's second argument involves the adequacy of the Corps' alternatives analysis, as required by 40 C.F.R. § 1502.14. Plaintiff maintains that the St. Bernard Parish residents' opposition to the project was accorded greater weight than was the opposition by residents in the IHNC area. Plaintiffs also compared the percentages of African American in the population near three of the alternative sites. In 1990, Meraux was 99.3% white and 4.3% African American; Violet was 75.3% white and 22.8% African American; the IHNC site was 75.3% white and 88.8% African American.

Despite ACORN's contentions regarding the Meraux site, that site had been completely eliminated from consideration by the time the FER was prepared. Therefore, the percentage of African Americans living in Meraux in 1990 is irrelevant. Only two sites were still under consideration when the EIS was prepared. A retroactive analysis of the plan's impact on the minority community of Meraux would truly be a vain and useless task, as that site was eliminated from consideration almost twenty years earlier.

The plaintiff has not specifically alleged or proven that the Corps' elimination of the Meraux Site from consideration during the 1970's was arbitrary and capricious. Essentially, ACORN's argument regarding the Meraux Site is that the site should have been reevaluated and reconsidered as a possible alternative in the FEIS or FER. However, Title 40 C.F.R. § 1502.14 only requires a brief discussion of alternatives previously eliminated from consideration. In this

16

case, the EIS refers to the 1975 Site Selection Report for reasons alternate plans were eliminated from consideration. The court cannot say that the Corps' treatment of the sites other than Violet and IHNC was arbitrary or capricious.

With respect to the Violet site, plaintiff has supplied the court with the percentage of the population which is African American for both the Violet and IHNC site. ACORN argues that the selection of the IHNC site was based on the higher percentage of African Americans living in that area. In support of this contention, plaintiff has attached affidavits of several residents of the affected neighborhoods who attest that they believe that the site selection was biased. Plaintiff also makes conclusory allegations in its briefing regarding the Corps' failure to state in the EIS that few households in Violet would be affected by the noise levels, allegedly hazardous chemicals, and evacuation problems associated with the project. On the other hand, plaintiff contends that noise, chemicals, and evacuation present serious problems for the residents near the IHNC site. On the other hand, the Corps attributes its selection of the IHNC site to environmental concerns at the Violet location and also to the preferability of utilizing the existing channel at the IHNC.

Unlike many of the cases cited by the parties, this case does not involve allegations that a defendant failed to perform an EIS. Rather, plaintiff alleges that the site selection was biased. Plaintiff has not presented the court with any affidavit delineating a specific fact scenario which could lead a reasonable trier of fact to conclude that the site selection was biased. The court only has affidavits of residents in the community who attest to their unsubstantiated beliefs that the process was biased.

NEPA only prescribes the necessary process, and does not mandate specific substantive

17

results. *See Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227-28 (1980).

Where adverse environmental effects of the proposed action are adequately identified and

evaluated, NEPA does not prohibit a decision that other factors outweigh costs to the

environment. *See Robertson*, 490 U.S. at 350. So long as the agency has properly considered

perceived adverse environmental effects, NEPA does not provide any basis to enjoin federal

action based on those effects. *Association Concerned About Tomorrow, Inc. v. Dole*, 610

F.Supp. 1101 (N.D.Tex.1985); *D'Agnillo v. U.S. Dept. of Housing and Urban Development*, 738

F.Supp. 1454 (S.D.N.Y.1990). The self-serving affidavits of the residents of the neighborhood

do not create a genuine issue of material fact. This court cannot fairly say that the selection of

the IHNC site over the Violet site was arbitrary and capricious. Therefore, summary judgment is

appropriate as to plaintiff's NEPA claims.


**B. 4(f)**

Plaintiff's second argument in support of its request for a preliminary injunction is that

the defendants failed to prepare a 4(f) statement in compliance with the National Transportation

Act. As explained above, under § 4(f) the Secretary of Transportation cannot approve a project

which uses or constructively uses land or structures eligible for inclusion on the National Historic

Register. In this case, while plaintiff has raised the historic significance of the Galvez Street

Wharf and the two historic neighborhoods affected by the project[4], the Secretary's sole function

in the implementation of this project will be to grant bridge permits related to the demolition

---

[4]The existing IHNC Lock itself has been determined eligible for inclusion in the National
Historic Register. Defendant's FER, Volume 1, p.45.

and/or alteration of the three bridges. The only structures actually "used" in the bridge phase of the project are the bridges themselves.[5] Of the three bridges slated for demolition or alteration, only the St. Claude Avenue Bridge has been determined eligible for the National Historic Register.

Defendants argue that the Secretary has not yet approved the project and will not do so until the Corps applies for bridge permits. In other words, the Secretary has taken no action for the court to decide was arbitrary and capricious. Rather, the question before the court is whether the Secretary has acted arbitrarily and capriciously by failing to perform a 4(f) analysis contemporaneously with the Corps' preparation of the EIS.

As noted above, the Secretary, through the Coast Guard, cannot grant any bridge permits without having first analyzed the use of historic resources. Thus, upon receipt of the Corps' application for bridge permits and the relevant information on affected historic resources, the DOT, through its agency the Coast Guard, must perform the 4(f) evaluation. The Corps does not anticipate applying for the Individual Bridge Permits until later in the project. Defendant's Exhibits H and I, Affidavits of Michael Stout and David Frank. ACORN argues that nothing prevents the Corps from applying for a bridge permit in advance of the commencement of the bridge phase of the project.[6] While this is true, nothing requires the Corps to apply for a bridge

---

[5] The court need not consider whether any aspect of the bridge phase of the project constitutes a "constructive use" of the surrounding historic neighborhoods since the court ultimately concludes that the 4(f) claim is premature.

[6] ACORN points out that while Individual Bridge Permits are usually applied for within two or three years prior to the commencement of a bridge project, this deadline is malleable. 33 C.F.R. 115.10. However, there is no requirement that the permit be applied for any more than three years in advance of a project.

permit at this time.

The plaintiff cites cases in which courts have held that the DOT has improperly segmented a project and has delayed the 4(f) analysis for a particular segment of a project until there are no prudent and feasible alternatives. *See, e.g., Named Individual Members of the San Antonio Conservation Society v. Texas Highway Department*, 446 F.2d 1013 (5th Cir. 1971), *cert denied,* 406 U.S. 933 (1972). However, the segmentation cases cited by plaintiff are inapplicable to this one. Those cases involve highway projects, which are the domain of the DOT. In the segmentation cases, the DOT, or one of its agencies, was the lead agency on the project.

In this case, on the other hand, the DOT is not the lead agency on the project and has done nothing to improperly segment the project. In this case, the 4(f) evaluation will be prepared by the DOT and/or its agency, the Coast Guard, separate and apart from the EIS, which was prepared by the Corps. The plaintiff argues that nothing prohibits the Secretary from performing a 4(f) analysis at this point. The court agrees. However, the court can find no regulation which requires the DOT or Coast Guard to perform the 4(f) evaluation before the Corps applies for a bridge permit.

Upon review of the administrative record, the court finds that the EIS does comply with the regulations cited by plaintiff. Specifically, the EIS does contain a list of the federal permits which will be required to complete the project. 40 C.F.R. § 1502.25. Furthermore, plaintiff cites 23 C.F.R. 771.135(a), which is inapplicable to this case. Title 23 C.F.R. 771.135(a) requires the Federal Highway Administration to perform a 4(f) evaluation contemporaneously with the EIS or

ROD when it is the lead agency on a project[7]. Because there is no requirement that the Secretary perform a 4(f) evaluation at this stage of the project, his failure to do so was not arbitrary and capricious. Accordingly, any 4(f) claims are premature at this time, and defendants are entitled to summary judgment as a matter of law.

## IV. Conclusion

In sum, the plaintiff has not created a genuine issue of material fact so as to withstand defendants' Motion for Summary Judgment. Plaintiff cannot demonstrate that it "has a substantial likelihood of success" in its request for an injunction, as required by Rule 65 and the case law. Thus, summary judgment on both the NEPA and 4(f) issues is appropriate.

New Orleans, Louisiana, this 20th day of April, 2000.

STANWOOD R. DUVAL, JR.
UNITED STATES DISTRICT JUDGE

---

[7]Even if the 23 C.F.R. 771.135 were applicable to the Coast Guard or the Department of Transportation, the regulation requires a 4(f) to be prepared contemporaneously with an EIS when the Federal Highway Administration is preparing both. Furthermore, regardless of the FHWA's conclusions in a 4(f) evaluation, this does not constitute cause to stop the project in progress. Therefore, even if the regulation at issue did require a 4(f) evaluation to have been performed, and if the 4(f) would have identified prudent and feasible alternatives to demolishing the St. Claude Avenue Bridge, still the court would not have grounds to enjoin the project.